AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Missouri

In the Matter of the Search of )
)
Item 1. A SanDisk USB Thumb Drive, securely stored at HSI, 1222 ) Case No. 4:25-MJ-9252 RHH
Spruce St, Room 7.303A, St. Louis, Missouri, 63103, stored in )
conjunction with Case Number SU07QR25SU0007, located in the ) SIGNED AND SUBMITTED TO THE COURT FOR
Eastern District of Missouri. (See Attachment A) ) FILING BY RELIABLE ELECTRONIC MEANS

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the          EASTERN          District of          MISSOURI          , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:   *Code Section - Offense Description*

18 U.S.C. § 2252A(a)(1) and (2) (receipt or distribution of child pornography), and 2252A(a)(5)(B) (possession of child pornography)

The application is based on these facts:
SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.

☐ Delayed notice of          days (give exact ending date if more than 30 days:          ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

I state under the penalty of perjury that the foregoing
is true and correct.

_____
*Applicant's signature*

Thomas Putting, SA
*Printed name and title*

Sworn to, attested to, or affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedures 4.1 and 41.

Date:          08/21/2025

_____
*Judge's signature*

City and state:  St. Louis, MO          Honorable Rodney H. Holmes, U.S. Magistrate Judge
*Printed name and title*

AUSA: Michael K. Hayes

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF **Item 1.** A SanDisk USB Thumb Drive, securely stored at HSI, 1222 Spruce St, Room 7.303A, St. Louis, Missouri, 63103, stored in conjunction with Case Number SU07QR25SU0007, located in the Eastern District of Missouri. (See Attachment A) | No. 4:25-MJ-9252 RHH<br><br>SIGNED AND SUBMITTED TO THE COURT FOR FILING BY RELIABLE ELECTRONIC MEANS<br><br>**FILED UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Thomas Putting, a Special Agent with Homeland Security Investigations, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search (1) SanDisk USB Thumb Drive and (1) SanDisk Micro SD card, located at HSI, 1222 Spruce St, Room 7.303A, St. Louis, Missouri, 63103, stored in conjunction with Case Number SU07QR25SU0007, located in the Eastern District of Missouri, further described in Attachment A, for the things described in Attachment B.

2. I have been employed as a Special Agent ("SA") of the U.S. Department of Homeland Security, Immigration and Customs Enforcement (ICE), Homeland Security Investigations ("HSI"), since March 2019, and am currently assigned to the HSI office in Saint Louis, Missouri. While employed by HSI, I have investigated federal criminal violations related to high technology or cybercrime, child exploitation, and child pornography. I have gained experience through training at the Federal Law Enforcement Training Center (FLETC) in

1

Brunswick, Georgia, and everyday work relating to conducting these types of investigations. I have received training in the area of child pornography and child exploitation and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media including computer media. Moreover, I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. §§ 2251, 2252, and 2252A, and I am authorized by law to request a search warrant.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2252A(a)(1) and (2) (receipt or distribution of child pornography), and 2252A(a)(5)(B) (possession of child pornography) (hereinafter the "SUBJECT OFFENSES") are presently located within the item(s) to be searched.

## ITEM(s) TO BE SEARCHED

5.      One (1) SanDisk USB thumb drive and one (1) SanDisk Micro SD card, which was found by Anthony THOMAS's sister when packing up THOMAS's property at her residence of 225 County Pointe Ct, Wentzville, MO, 63385.  The devices are currently located at HSI, 1222 Spruce St, Room 7.303A, St. Louis, Missouri, 63103 and stored in conjunction with Case Number SU07QR25SU0007.

2

## DEFINITIONS

6.     The following definitions apply to this Affidavit and Attachment B:

a.     The "BitTorrent Network" is a very popular and publicly available peer-to-peer file sharing network. Most computers that are part of this network are referred to as "peers." Like most sharing networks, it is decentralized, as there is not any central hub for the network; also, files are not stored on a central server but are exchanged directly between users based on the peer-to-peer principle of the BitTorrent network protocol. In order to share a file or a set of files on the BitTorrent network, a "Torrent" file needs to be created by the user that initially wants to share the file or set of files.

b.     "Cache" refers to text, image and graphic files sent to and temporarily stored by a user's computer from a web site accessed by the user in order to allow the user speedier access to and interaction with that web site.

c.     "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

d.     "Child pornography," as defined in 18 U.S.C. § 2256(8), includes any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, or the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

3

e.      "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones and wireless telephones.

f.      "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

g.      "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys,

4

which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

h.    "Geo-located," as used herein, refers to the identification of the geographical location of (a person or device) by means of digital information processed via the Internet.

i.    A "hash value" is a unique multi-character number that is associated with a computer file. Some computer scientists compare a hash value to an electronic fingerprint in that each file has a unique hash value. Any identical copy of the file will have exactly the same hash value as the original, but any alteration of the file, including even a change of one or two pixels, would result in a different hash value. Hash values represent large amounts of data as much smaller numeric values, so they are used with digital signatures.

j.    "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

k.    An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may

5

be directed properly from its source to its destination. Most Internet Service Providers ("ISPs") control a range of IP addresses. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

l.    The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

m.    "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

n.    "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, sharing photos or videos, reading a book, or playing a game.

o.    A "Peer-to-Peer Network" is a sharing and delivery of user specified files among groups of people who are logged onto a file sharing network via the Internet; a type of Internet network that allows users with the same, or similar, program to connect with each other and access files on one another's hard drive.

6

p. "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

q. "Remote computing service," as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

r. "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

s. "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

t. A "SHA1" (also referred to as "SHA-1") is an algorithm that uses the Secure Hash Algorithm (SHA), developed by the National Institute of Standards and Technology (NIST), along with the National Security Agency (NSA), for use with the Digital Signature Standard (DSS) as specified within the Secure Hash Standard (SHS). The United States of America has adopted the SHA-1 hash algorithm described herein as

7

a Federal Information Processing Standard. Basically, the SHA1 is an algorithm for computing a condensed representation of a message or data file like a fingerprint.

u.    A "Torrent" is typically a small file that describes the file(s) that are being shared, which may include information on how to locate the file(s) on the BitTorrent network. A typical BitTorrent client will have the ability to create a "Torrent" file. It is important to note that the "Torrent" file does not contain the actual file(s) being shared, but information about the file(s) described in the "Torrent", such as the name(s) of the file(s) being referenced in the "Torrent" and the "info hash" of the "Torrent". The "info hash" is a SHA-1 hash value of the set of data describing the file(s) referenced in the "Torrent", which include the SHA-1 hash value of each file piece, the file size, and the file name(s). The "info hash" of each "Torrent" uniquely identifies the "Torrent" file on the BitTorrent network. The "Torrent" file may also contain information on how to locate file(s) referenced in the "Torrent" by identifying "Trackers".

v.    "Trackers" are computers on the BitTorrent network that collate information about the peers/clients that have recently reported they are sharing the files(s) referenced in the "Torrent" file. A "Tracker" is only a pointer to peers/clients on the network who may be sharing part, or all of the file(s) referenced in the "Torrent". It is important to note that the "Trackers" do not actually have the files(s) and are used to facilitate the finding of other peers/clients that have the entire file(s) or at least a portion of the file(s) available for sharing. Typical client-side software that can be installed on a subject's machine to share files over this network include BitTorrent, uTorrent, Vuze, and other client programs. Once installed on a computer system, a user can search the

8

network for files. The BitTorrent network supports searching of files by the user's use of keyword searchers within the BitTorrent network client itself or on websites hosting "Torrents". Once a "Torrent" file is located that meets the keyword search criteria, the user will download the "Torrent" file to their computer. The BitTorrent network client will then process that "Torrent" file in order to find "Trackers" or utilize other means that will help facilitate finding other peers/clients on the network that have all or part of the files(s) referenced in the "Torrent" file.

w.    The term "web site" consists of text pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol.

x.    "Wireless telephone or mobile telephone, or cellular telephone or cell phone or smartphone" as used herein means a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal

9

calendars; and accessing and downloading information from the Internet. Wireless telephones may have wireless connection capabilities such as Wi-Fi and Bluetooth. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

## COMPUTERS AND CHILD PORNOGRAPHY

7.      From my own training and experience in the area of Internet-based child exploitation investigations, and through consultation with other knowledgeable law enforcement officials, I know the following to be true. Computers connected to the Internet identify each other by an Internet Protocol ("IP") address. An IP address can assist law enforcement in finding a particular computer on the Internet. These IP addresses can typically lead a law enforcement officer to a particular Internet service company and that company can typically identify the account that uses or used the address to access the Internet.

8.      Computers and computer technology have revolutionized the way in which child pornography is produced, distributed and utilized. Prior to the advent of computers and the Internet, child pornography was produced using cameras and film, resulting in either still photographs or movies. To distribute these images on any scale also required significant resources. The distribution of these wares was accomplished through a combination of personal contacts, mailings, and telephone calls, and compensation for these wares would follow the same paths. More recently, through the use of computers and wireless telephones, child pornography is traded through the Internet, by using, for example, file sharing software.

9.      Producers of child pornography can now produce both still and moving images directly from a common video or digital camera, as well as from a wireless telephone. As a result

10

of this technology, it is relatively inexpensive and technically easy to produce, store, and distribute child pornography. In addition, there is an added benefit to the pornographer in that this method of production does not leave as large a trail for law enforcement to follow.

10.    The Internet allows any computer (including wireless telephone) to connect to another computer. By connecting to a host computer, electronic contact can be made to literally millions of computers around the world. A host computer is one that is attached to a network and serves many users. Host computers are sometimes operated by commercial ISPs which allow subscribers to connect to a network which is, in turn, connected to the host systems. Host computers, including ISPs, allow e-mail service between subscribers and sometimes between their own subscribers and those of other networks. In addition, these service providers act as a gateway for their subscribers to the Internet or the World Wide Web.

11.    The Internet allows users, while still maintaining anonymity, to easily locate (i) other individuals with similar interests in child pornography; and (ii) Web sites that offer images of child pornography. Child pornography collectors can use standard Internet connections to communicate with each other and to distribute child pornography. These communication links allow contacts around the world as easily as calling next door. Additionally, these communications can be quick, relatively secure, and as anonymous as desired. All of these advantages, which promote anonymity for both the distributor and recipient, are well known and are the foundation of transactions between child pornography collectors over the Internet. Sometimes the only way to identify both parties and verify the transportation of child pornography over the Internet is to examine the recipient's computer, including the Internet history and cache to look for "footprints" of the Web sites and images accessed by the recipient.

11

## THE USE OF PEER-TO-PEER (P2P) FILE SHARING SOFTWARE TO DISTRIBUTE CHILD PORNOGRAPHY ON THE BITTORRENT NETWORK

12.     Millions of computer users throughout the world use peer-to-peer (P2P) file sharing networks to share files containing music, graphics, movies and text.  These networks have also become a popular way to download and distribute child pornography.  Any computer user who can connect to the internet can download P2P application software, which is typically free, and use it to share files through a P2P network.

13.     The BitTorrent network is a publicly available P2P file sharing network.  Most computers that are part of this network are referred to as "peers" or "clients."  A peer/client can simultaneously provide files to some peers/clients while downloading files from other peers/clients.

14.     The BitTorrent network can be accessed by peer/client computers via many different BitTorrent network client (software) programs, examples of which include the BitTorrent client program, uTorrent client program, and Vuze client program, among others.  These client programs are publicly available and typically free P2P client software programs that can be downloaded from the Internet.

15.     During the installation of typical BitTorrent network client programs, various settings are established which configure the host computer to share files via automatic uploading.  Typically, as users download files or pieces of files from other peers/clients on the BitTorrent network, other users (peers/clients) on the network can download the files or pieces of files from them, a process which maximizes the download speeds for all users on the network.  Once a user has completed the download of an entire file or files, they can also continue to share the file with

12

individuals on the BitTorrent network who are attempting to download all pieces of the file or files, a process referred to as "seeding."

16.     Files or sets of files are shared on the BitTorrent network via the use of "Torrents." A "Torrent" is typically a small file that describes the file(s) to be shared. It is important to note that "Torrent" files do not contain the actual file(s) to be shared, but information about the file(s) to be shared. This information includes things such as the name(s) of the file(s) being referenced in the "Torrent" and the "info hash" of the "Torrent." The "info hash" is a SHA1 hash value of the set of data describing the file(s) referenced in the "Torrent." This set of data includes the SHA1 hash value of each file piece in the torrent, the file size(s), and the file name(s). The "info hash" of each "Torrent" uniquely identifies the "Torrent" file on the BitTorrent network. The "Torrent" file may also contain information on how to locate file(s) referenced in the "Torrent" by identifying "Trackers." "Trackers" are computers on the BitTorrent network that collate information about the peers/clients that have recently reported they are sharing the file(s) referenced in the "Torrent" file. A "Tracker" is only a pointer to peers/clients on the network who may be sharing part, or all of the file(s) referenced in the "Torrent." "Trackers" do not actually have the file(s) but are used to facilitate the finding of other peers/clients that have the entire file(s) or at least a portion of the file(s) available for sharing. It should also be noted that the use of "Tracker(s)" on the BitTorrent network are not always necessary to locate peers/clients that have file(s) being shared from a particular "Torrent" file. There are many publicly available servers on the Internet that provide BitTorrent tracker services.

13

17.    In order to locate "Torrent" files of interest and download the files that they describe, a typical user will use keyword searches on torrent indexing websites, examples of which include isohhunt.com and thepiratebay.org. Torrent indexing websites are essentially search engines that users on the BitTorrent network use to locate "Torrent" files that describe the files they are looking to download. Torrent indexing websites do not actually host the content (files) described by "Torrent" files, only the "Torrent" files themselves. Once a "Torrent" file is located on the website that meets a user's keyword search criteria, the user will download the "Torrent" file to their computer. The BitTorrent network client program on the user's computer will then process that "Torrent" file in order to find "Trackers" or utilize other means that will help facilitate finding other peers/clients on the network that have all or part of the file(s) referenced in the "Torrent" file. It is again important to note that the actual file(s) referenced in the "Torrent" are obtained directly from other peers/clients on the BitTorrent network and not the "Trackers" themselves. Typically, the "Trackers" on the network return information about remote peers/clients that have recently reported they have the same file(s) available for sharing (based on SHA1 "info hash" value comparison), or parts of the same file(s), referenced in the "Torrent", to include the Internet Protocol (IP) addresses of the remote peers/clients.

18.    For example, a person interested in obtaining child pornographic images or videos on the BitTorrent network can go to a torrent indexing website and conduct a keyword search using a term such as "preteen sex" or "pthc" (pre-teen hardcore). The results of the keyword search are typically returned to the user's computer by displaying them on the torrent indexing website. Based on the results of the keyword search, the user would then select a "Torrent" of interest to them to download to their computer from the website. Typically, the BitTorrent client

14

program on their computer will then process the "Torrent" file. Utilizing trackers and other BitTorrent network protocols, peers/clients would then be located that have recently reported they have the file(s) or parts of the file(s) referenced in the "Torrent" file available for sharing. The file or files are then downloaded directly from the computer(s) sharing the file or files to the user's computer. Typically, once the BitTorrent network client has downloaded part of a file or files, it may immediately begin sharing the part of the file or files it has with other users on the network. The BitTorrent network client program succeeds in reassembling the file(s) from different sources only if it receives "pieces" with the exact SHA1 piece hash described in the "Torrent" file. The downloaded file or files are then stored in an area (folder) previously designated by the user and/or the client program on the user's computer or designated external storage media. The downloaded file or files, including the torrent file, will remain in that location until moved or deleted by the user.

19. Law enforcement efforts have resulted in the creation of BitTorrent network client programs that obtain information from "Trackers" about peers/clients on the BitTorrent network recently reporting that they are involved in sharing digital files of known or suspected child pornography, based on "info hash" SHA1 hash values of torrents which have been previously identified by law enforcement as being associated with such files. The law enforcement BitTorrent network client programs allow for single-source downloads of files of child pornography or suspected child pornography from a computer at a single IP address, meaning that an entire file or files are downloaded only from a computer at a single IP address as opposed to obtaining the file from multiple peers/clients on the BitTorrent network. This procedure

15

allows for the detection and investigation of those computers involved in sharing digital files of known or suspected child pornography on the BitTorrent network.

20.    During the query and/or downloading process from a suspect BitTorrent network client, certain information may be exchanged between the law enforcement BitTorrent client program and the suspect client program they are querying and/or downloading a file from. This information includes 1) the suspect client's IP address; 2) a confirmation from the suspect client that they have pieces of the file(s) being requested, in whole or in part, and that the pieces of the file(s) is or are being reported as shared from the suspect client program; and 3) the BitTorrent network client program and version being utilized by the suspect computer. The law enforcement BitTorrent client program can log this information.

21.    The investigation of peer-to-peer (P2P) file sharing networks is a cooperative effort of law enforcement agencies around the country. Many of these agencies are associated with the Internet Crimes against Children (ICAC) Task Force Program. P2P investigative methodology has led to the issuance and execution of search warrants around the country resulting in the arrest and conviction of numerous offenders possessing and/or distributing child pornography, some of which were also involved in the active sexual exploitation of actual child victims.

## **PROBABLE CAUSE**

22.    On or about December 4, 2024, your affiant was conducting an undercover investigation on the BitTorrent Peer-to-Peer (P2P) file sharing network. A connection was made between your affiant's investigative computer and a computer device running BitTorrent software with the assigned IP address 71.81.76.40:57356 between December 4, 2024, at 12:01

16

a.m. UTC to December 4, 2024, at 5:32 a.m. Your affiant was able to download approximately eight-six (86) video files which is referenced by torrent with infohash be9bf320f4a194c2026d18a8af08aac124926a3c.

23.    Out of the approximate 86 video files, your affiant observed approximately twenty-five (25) video files of child pornography.  Descriptions of a few of the files are as follows:

    a.    "Laura Pussy Fuck", is a video file that is approximately seven (7) minutes and twenty-one (21) seconds in length, that depicts, in part, an apparent minor female, approximately eight (8) to ten (10) years old, being vaginally penetrated by an apparent adult male's penis.

    b.    "HMM- Melissa Set 03 Part 5, is a video file that is approximately five (5) minutes and thirty-two (32) seconds in length, that depicts, in part, a minor female, approximately four (4) to five (5) years old, wearing a yellow dress and being penetrated by an apparent adult male's penis.  Another minor female, approximately seven (7) to ten (10) years old, who is wearing white stockings, is vaginally penetrated by the apparent adult male.

24.    Additional connections were made between your affiant's investigative computer and a computer device running BitTorrent software with the following IP addresses and times:

    a.    71.81.76.40:57197 on December 23, 2024, at 6:41 p.m. UTC

        i.    Approximately 99 video files were transferred from IP address 71.81.76.40:57197.   One such file transferred was named ""000093", which is a video file approximately three (3) minutes and twenty-four (24)

17

seconds in length, that depicts, in part, a minor females, approximately four (4) to (5) years of age, nude in a bathtub. The minor female stands up and then starts touching her vagina while facing the camera. An apparent adult male then starts to touch the minor female's vagina. The minor female then performs oral sex on an apparent adult male.

b.  71.81.76.40:34938 on January 15, 2025, at 4:07 p.m. UTC

    i.  Approximately 104 files were transferred from IP address 71.81.76.40:34938. Multiple files were video files of child pornography. One such file named "04m17s.320x240.PTHC.2012.6yo.Elly.BJ", is a video file approximately four minutes and seventeen (17) seconds in length, that depicts, in part, a minor female, approximately five (5) to six (6) years old, who appears to be performing oral sex on an apparent adult male. The adult male then appears to ejaculate into the minor female's mouth while also touching the minor female's vagina.

c.  71.81.76.40:49825 on January 15, 2025, at 9:37 p.m. UTC

    i.  Approximately 111 files were transferred from IP address 71.81.76.40:49825. Multiple files were video files of child pornography. One such file named "PToddlerXCbaby.4Yo.bPthcm.3HussyfanJ.DRaygoldH.pAbusedS.Abuse .Chiddy", is a video file that is thirty-four (34) seconds in length, that depicts, in part, a minor female, who is approximately three (3) to four (4)

18

years old, who is topless and wearing black leggings, getting ejaculated on their mouth by an apparent adult male.

25.    A query of the American Registry for Internet Numbers ("ARIN") online database revealed that the IP address 71.81.76.40 is registered to Charter Communications.

26.    On or about December 4, 2024, an HSI administrative summons (HIS-SU-2025-016695-001) was issued to Charter Communications Inc., for the assigned subscriber to IP address 71.81.76.40:57356 used December 4, 2024, at 12:01 a.m. UTC.

27.    On or about December 10, 2024, Charter Communications Inc, responded to HSI's administrative summons. Specifically, the records showed the following subscriber information:

| | |
|---|---|
| Name: | Mohammad Chughtai |
| Address: | 225 Country Pointe Ct, Wentzville, MO 63385 |
| Phone Number: | 636-466-1925 |
| Account Number: | 8345781550986121 |
| Email Address: | mac6408@aol.com |
| MAC: | 84D81B834575 |
| Lease Start Date: | 12/23/2023 1:03 AM |
| Lease End Date: | 12/11/2024 1:55 PM |

28.    On or about January 18, 2025, an HSI administrative summons (HIS-SU-2025-027004-001) was issued to Charter Communications Inc., for the assigned subscriber to IP address 71.81.76.40:07197 used December 23, 2024, at 6:41 p.m. UTC, IP address

19

71.81.76.40:34938 used January 15, 2025, at 4:07 p.m. UTC, and IP address 71.81.76.40:49825, used January 15, 2025, at 9:37 p.m. UTC.

29.    On or about June 24, 2022, Charter Communications Inc. responded to HSI's administrative summons. Specifically, the records showed the following subscriber information:

Name:    Mohammad Chughtai

Address:    225 Country Pointe Ct, Wentzville, MO 63385

Phone Number:    636-466-1925

Account Number:    8286100500517087

Email Address:    MAC6408@aol.com

MAC:    84D81B834575

30.    A check with public database systems on or about February 5, 2025, revealed that an individual named Anne Marie Thomas with a Date of Birth of XX XX, 1978, a Tetiana ROZHKO with a Date of Birth of XX XX, 2001, and a Dietrich V GOSSMEYER with a Date of Birth of XX XX, 2000, an Anthony B THOMAS with a Date of Birth of XX XX, 1976, and a Mohammad Ahsan CHUGHTAI with a Date of Birth of XX XX 1975, were residing at the suspect address.

31.    On or about February 18, 2025, your affiant received information from the United States Postal Service that there are many individuals who receive mail at the suspect address. The last names of individuals who received mail on February 18, 2025, were THOMAS, GOSSMEYER, and REZHKO.

32.    On February 24, 2025, your affiant used his government-issued iPhone to gain additional information regarding any potential wireless networks at the suspect address.

20

Positioned approximately forty (40) yards from the suspect address, your affiant noted that there were multiple wireless networks in the area, but all of them were secured. Accordingly, to use any of them to access the Internet, a user would likely have to know the encryption key or password for that particular network. Based on the signal strength of the wireless networks, as well as my training and experience and information relayed to me by agents, your affiant believed that the wireless router at the suspect address was likely generating a secured wireless network. As explained above, I know, from my training and experience and information relayed to me by agents, that wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime.

33.    On March 6, 2025, HSI obtained a lawful federal search warrant for 225 County Pointe Court, Wentzville, MO 63385. On March 19, 2025, HSI executed the search warrant and seized multiple items from Anthony THOMAS. A forensic examination was conducted on THOMAS's device and discovered multiple files of child pornography along with images and videos from a hidden camera in his ex-girlfriend's minor daughter's bedroom, which depicted the minor in various stages of undress. THOMAS admitted that he installed the hidden camera. During the execution of the search warrant, HSI agents also recovered a photograph of the minor victim, along with camera components and condoms, all of which they found in a secure safe.

34.    On March 26, 2025, a federal grand jury in the Eastern District of Missouri, indicted THOMAS for one (1) count of Receipt of Child Pornography. On March 27, 2025, HSI arrested THOMAS.

35.    On August 11, 2025, THOMAS's sister contacted your affiant stating they were packing up THOMAS's belongings from their residence and found a SanDisk USB Thumb drive

21

and a SanDisk micro-SD card.  THOMAS's sister stated they found the above items in a white IKEA drawer next to some liquid nicotine.

36.    On August 19, 2025, THOMAS's sister handed over the SanDisk USB thumb drive and the SanDisk micro-SD card over to your affiant at the St. Louis HSI office.

37.    It is your affiant's belief that these devices contain child pornography since there were numerous files of child pornography found on THOMAS's other devices.

## CHARACTERISTICS OF INDIVIDUALS WHO RECEIVE AND COLLECT IMAGES OF CHILD PORNOGRAPHY

38.    Based upon my own knowledge, experience, and training in child exploitation and child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the receipt and collection of child pornography:

a.    Child pornography collectors may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b.    Collectors of child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Child pornography collectors oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

22

c.     Collectors of child pornography almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Child pornography collectors typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d.     Likewise, collectors of child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the collector to view the collection, which is valued highly.

e.     Child pornography collectors also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f.     Collectors of child pornography prefer to have continuous access to their collection of child pornography. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

39.     Based upon the conduct of individuals involved in the collection of child

23

pornography set forth above, namely, that they tend to maintain their collections at a secure, private location for long periods of time, there is probable cause to believe that evidence of the offenses of receiving and possessing child pornography is currently located within the items described previously herein.

## SEIZURE OF EQUIPMENT AND DATA

40.     Based upon my knowledge, training and experience, I know that in order to completely and accurately retrieve data maintained in computer hardware or on computer software, to ensure accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that some computer equipment, peripherals, related instructions in the form of manuals and notes, as well as the software utilized to operate such a computer, be seized and subsequently processed by a qualified computer specialist in a laboratory setting. This is true because of the following:

a.     The volume of evidence. Computer storage devices (such as hard disks, diskettes, tapes, laser disks, etc.) can store the equivalent of thousands of pages of information. Additionally, a user may seek to conceal criminal evidence by storing it in random order with deceptive file names. Searching authorities are thus required to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This sorting process may take weeks or months, depending on the volume of data stored and it would be impractical to attempt this kind of data analysis on-site.

b.     Technical requirements. Analyzing computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled

24

environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know prior to the search which expert possesses sufficient specialized skills to best analyze the system and its data. No matter which system is used, however, data analysis protocols are exacting scientific procedures, designed to protect the integrity of the evidence and to recover even "hidden", erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

41.    Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically

25

maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

## COMPUTER EXAMINATION METHODOLOGY TO BE EMPLOYED

42.     The examination procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following techniques (the following is a non-exclusive list, as other examination procedures may be used):

a.      examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

b.      searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.      surveying various file directories and the individual files they contain;

d.      opening files in order to determine their contents;

e.      scanning storage areas;

26

f.      performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B; and/or

g.      performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment B.

## CONCLUSION

43.    Based on the above information, there is probable cause to believe that the SUBJECT OFFENSES have been violated, and that the property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B of this Affidavit, are located within the SUBJECT PREMISES described in Attachment A. Your Affiant requests authority to seize such material, specifically, that the Court issue a search warrant for these premises and all computers, computer hardware and media, and wireless telephones therein.

I state under the penalty of perjury that the foregoing is true and correct.

THOMAS PUTTING
Special Agent
Homeland Security Investigations

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 on this __21st__ day of August 2025.

HONORABLE RODNEY H. HOLMES
United States Magistrate Judge

27

**SW 4:25-MJ-9252 RHH**

**ATTACHMENT A**

**DESCRIPTION OF ITEMS TO BE SEARCHED**

Item 1.   One (1) SanDisk USB thumb drive,

which was found by Anthony THOMAS's sister when packing up THOMAS's property at her

residence of 225 County Pointe Ct, Wentzville, MO, 63385.  The device is currently located at

HSI, 1222 Spruce St, Room 7.303A, St. Louis, Missouri, 63103 and stored in conjunction with

Case Number SU07QR25SU0007.

1

<u>SW 4:25-MJ-9252 RHH</u>
## ATTACHMENT B
## LIST OF ITEMS TO BE SEIZED

All records, items, and information constituting evidence, instrumentalities and contraband concerning the violations of 18 U.S.C. §§ 2252A(a)(1) (receipt or distribution of child pornography) and 2252A(a)(5)(B) (possession of child pornography), including as follows:

1.      All visual depictions, including still images, videos, films or other recordings of child pornography or minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, and any mechanism used for the distribution, receipt or storage of the same contained in the following:

**(1) SanDisk USB Thumb drive.**

2.      Any and all computer passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code.

3.      Any and all documents, records, emails, and internet history pertaining to the possession or production of child pornography or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, or pertaining to an interest in child pornography whether transmitted or received.

4.      Any and all records, documents, invoices, notes and materials that pertain to accounts with any Internet Service Provider, as well as any and all records relating to the ownership or use of computer equipment found in the residence.

2